PHYLLIS SMITH,

        Plaintiff,

vs.                                    CASE NO. 3:07-cv-1165-J-TEM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

## ORDER AND OPINION

This matter is before the Court on Plaintiff's complaint (Doc. #1), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for a period of disability and disability insurance benefits ("DIB"). Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated February 25, 2008 (Doc. #9). The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number).

The undersigned has reviewed and given due consideration to the record in its entirety, including the parties' arguments presented in their briefs and the materials provided in the transcript of the underlying proceedings. Upon review of the record, the undersigned found the issues raised by Plaintiff were fully briefed and determined oral argument would not benefit the undersigned in making his determinations.

Accordingly, the instant matter has been decided on the written record. For the reasons set out herein, **the Commissioner's decision is AFFIRMED**.

# I. Procedural History

Plaintiff filed an application for DIB on October 2, 2003 (Tr. 85-87). Plaintiff claimed a disability onset date of June 25, 2003 (Tr. 85-87). A hearing was held on September 2, 2005 before Administrative Law Judge Peter Edison, and he issued an unfavorable decision on December 12, 2005 (Tr. 27-38, 452-72). Plaintiff appealed the decision and on March 23, 2006 the Appeals Council entered an Order remanding Plaintiff's claim for additional proceedings (Tr. 41-42).

A second hearing was held on December 12, 2006 before Administrative Law Judge JoAnn L. Anderson (the "ALJ")—at which, Plaintiff appeared and testified and was represented by attorney Laurie Gaglione (Tr. 400-51). After reviewing the medical evidence of record and hearing testimony at this hearing, the ALJ issued an unfavorable decision on March 8, 2007 (Tr. 12-24). On October 12, 2007, the Appeals Council denied review of the ALJ's March 8, 2007 decision, which became the Commissioner's final decision (Tr. 7-9). Plaintiff now seeks the Court's review of the ALJ's unfavorable decision (Doc. #1).

# II. Standard of Review

A plaintiff is entitled to disability benefits under the Social Security Act when he or she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).

The Commissioner has established a five-step sequential evaluation process for determining whether a plaintiff is disabled and therefore entitled to benefits. *See* 20 C.F.R.

§ 404.1520(a)(4)(i-v);[1] *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). The scope of this Court's review is generally limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence. *See also Richardson v. Perales*, 402 U.S. 389, 390 (1971).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as more than a scintilla—*i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (*citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982)).

Where the Commissioner's decision is supported by substantial evidence, the Court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560.

---

[1] All references made to 20 C.F.R. will be to the 2008 edition unless otherwise specified.

The Commissioner must apply the correct law and demonstrate that he has done so. While the Court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of HHS*, 21 F.3d 1064, 1066 (11th Cir. 1994) (*citing Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the reviewing court must not re-weigh the evidence, but must determine whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that the plaintiff is not disabled. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

As in all Social Security disability cases, Plaintiff bears the ultimate burden of proving disability, and is responsible for furnishing or identifying medical and other evidence regarding his or her impairments. *Bowen*, 482 U.S. at 146 n.5; *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987); 42 U.S.C. § 423(d)(5) ("An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."). It is a plaintiff's burden to provide the relevant medical and other evidence that he or she believes will prove they suffer from disabling physical or mental functional limitations. 20 C.F.R. § 404.704.

### III. Background Facts

Plaintiff was born on May 30, 1970, completed high school, and has past relevant work experience as a mail clerk, data entry clerk, file clerk, sales clerk, nursery school attendant, salesperson, and statement clerk (Tr. 85, 161). Plaintiff alleges she became disabled on June 25, 2003 due to problems with her right arm and hand, left leg and foot, a hole in her spine, and nerve problems (Tr. 115).

On June 30, 2003, Plaintiff underwent gastric bypass surgery at Shands Hospital ("Shands") (Tr. 325-30). That evening, Plaintiff developed numbness and tingling, which progressed to weakness in her lower and upper extremities (Tr. 325). Follow-up nerve conduction studies and electromyograms ("EMGs") were recommended if Plaintiff continued to be symptomatic (Tr. 325).

On August 18, 2003, Harry Koslowski, M.D. ("Dr. Koslowski"), examined Plaintiff for right arm and left leg numbness, and for numbness and pain in all of her fingers (Tr. 198-200). Plaintiff rated her pain level as seven on a ten point pain scale, with ten being the highest threshold of pain; however, Plaintiff stated she was able to drive and perform all of her activities of daily living (Tr. 198-99). Dr. Koslowski reported Plaintiff having neck pain but ruled out disc disease compressing the C6 nerve root (Tr. 200).

On August 25, 2003, a magnetic resonance imaging ("MRI") of Plaintiff's cervical spine revealed a small syrinx[2] within the cervical spinal cord (Tr. 197). On September 2, 2003, a cervical MRI was performed, which revealed no abnormal signal in the syrinx and

---

[2]"Syrinx" is defined by *Stedman's Medical Dictionary* as follows: "[G. a tube, pipe]. 1. A rarely used synonym for fistula. 2. A pathologic tube-shaped cavity in the brain or spinal cord." *Stedman's Medical Dictionary*, 894 (William R. Hensyl et al. eds., Williams & Wilkins 25th ed. 1990) (1911).

a punctuate focus of increased T2 signal within the cervical cord at the C5 level (Tr. 196). On September 4 and September 24, 2003, Dr. Koslowski examined Plaintiff and noted weakness of her deltoid on the right side and decreased pinprick sensation in a stocking distribution as well as in the C6 distribution (Tr. 195, 332). On September 4, 2003, Dr. Koslowski started Plaintiff on Neurontin and increased the dosage on September 24, 2003 (Tr. 195, 332).

On November 21, 2003, state agency Single Decision Maker ("SDM") Martin[3] performed a Physical Residual Functional Capacity ("RFC") assessment of Plaintiff (Tr. 202-07). SDM Martin reported Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk at least six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push, pull, reach, finger, and feel 2/3 of the time with her right upper extremities (Tr. 203, 205).

On April 29, 2004, Peter Knox, M.Ed., Psy.D. ("Dr. Knox"), performed a mental consultative examination of Plaintiff (Tr. 226-31). Plaintiff indicated that she had no limitation on her left hand and that she had limited ability to lift and carry with her right hand (Tr. 230). Plaintiff stated that her left leg would become stiff if she sat too long (Tr. 230). Additionally, Plaintiff informed Dr. Knox that she could walk for no more than twenty minutes (Tr. 230). Plaintiff described her daily activities as getting her son up, feeding her baby, cooking , washing clothes, making the bed, and other "stuff" around the house (Tr. 231). Plaintiff stated that she was a social person with her family, had a good social life, and went to church three days per week, went to weekend movies, and visited her mother's

---

[3]The SDM's first name is illegible (Tr. 207).

house for cookouts (Tr. 231).

On May 4, 2004, William Choisser, M.D. ("Dr. Choisser"), performed a consultative physical examination of Plaintiff (Tr. 232-35). Plaintiff demonstrated a somewhat reduced grip strength and 4/5 fine dexterity, but her pulses and reflexes were equal in all extremities (Tr. 233). Plaintiff had some swelling in her left leg and right arm, but straight leg raises were full bilaterally in both seated and supine positions (Tr. 233). All of Plaintiff's ranges of motion were normal and Plaintiff had no spasms (Tr. 233-35). Dr. Choisser diagnosed Plaintiff with diabetes, generalized aches and pains, left leg swelling, and morbid obesity (Tr. 233).

On May 27, 2004, state agency medical consultant, Donald Morford, M.D. ("Dr. Morford"), performed an RFC assessment of Plaintiff (Tr. 250-57). Dr. Morford reported Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk at least six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation (Tr. 251). Additionally, Dr. Morford opined that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 252).

On February 25, 2004, Plaintiff sought treatment at Shands for left leg, right hand, back, and neck pain (Tr. 320). Timothy Sternberg, M.D. ("Dr. Sternberg"), examined Plaintiff and found normal range of motion in Plaintiff's neck and that Plaintiff was able to reach over her head and clap her hands (Tr. 320-23). Plaintiff had some decreased sensation in her right hand, but bilateral grips were normal and all her fingers had normal ranges of motion and strength (Tr. 321). Dr. Sternberg reported Plaintiff's lumbar flexion was normal and Plaintiff reported pain and shooting numbness down her left leg (Tr. 321). Dr. Sternberg noted Plaintiff's leg strength, straight leg raises, and gait were normal (Tr.

321). Furthermore, Dr. Sternberg indicated that Plaintiff was preoccupied with pain, anxious, and had trouble sleeping (Tr. 321).

On November 1, 2004, Craig Senzon, M.D. ("Dr. Senzon"), performed a consultative examination of Plaintiff (Tr. 311-13). Dr. Senzon reported Plaintiff had a definite etiology to explain her symptoms but her diagnosis was complicated due to the possibility that she may have had a stroke after the gastric bypass surgery (Tr. 312). On March 8, 2005, Dr. Senzon saw Plaintiff and reported that Topamax was somewhat effective in helping Plaintiff with pain (Tr. 304). On April 7, 2005, Dr. Senzon conducted a follow-up examination of Plaintiff (Tr. 301). Dr. Senzon indicated Plaintiff complained of leg pain since the prior examination but noted that, for two weeks, she did not take Topamax because she ran out (Tr. 301). On April 7, 2005, Dr. Senzon increased Plaintiff's dosage of Topamax (Tr. 301).

On February 14, 2005, Tai Nguyen, M.D. ("Dr. Nguyen"), performed a consultative examination of Plaintiff (Tr. 305-06). Dr. Nguyen noted that MRIs revealed a small lesion in Plaintiff's brain and on her spinal cord but they did not represent a surgical problem (Tr. 306). A follow-up MRI revealed the possibility of a focal syrinx (Tr. 300). On May 6, 2005, Plaintiff returned to Shands with additional complaints of pain (Tr. 291-92). Dr. Senzon reported no significant complaints regarding Topamax and normal muscle strength in her upper and lower extremities (Tr. 291).

On June 10, 2005, Alan Berger, M.D. ("Dr. Berger"), performed a neurophysiologic examination of Plaintiff (Tr. 286-87). Dr Berger reported moderate to severe bilateral median nerve entrapments of the wrists and moderate to severe bilateral ulnar nerve entrapments of the elbows (Tr. 287).

On July 5, 2005, Joseph Costa, D.O. ("Dr. Costa"), treated Plaintiff for decreased ability to empty her bladder (Tr. 262-63). Dr. Costa diagnosed Plaintiff with a urinary tract infection and noted Plaintiff had normal range of motion and strength in all four extremities (Tr. 263).

On July 11, 2005, Scott Silliman, M.D. ("Dr. Silliman"), performed a follow-up examination of Plaintiff at Shands (Tr. 280-81). Plaintiff complained of a burning pain in her right foot (Tr. 280). Dr. Silliman noted Plaintiff's right hand/forearm dysesthesias was primarily nocturnal (Tr. 281). Dr. Silliman indicated that Neurontin and Topamax adequately suppressed neuropathic pain throughout Plaintiff's right side except for the hand, wrist, and forearm dysesthesias (Tr. 280). Dr. Silliman reported no observed hand atrophy and normal tone and strength in all four extremities (Tr. 280).

On August 24, 2005, Marion Graham, a nurse practitioner at Shands, wrote a general letter stating Plaintiff was unable to work due to a variety of conditions (Tr. 324).

On September 19, 2005, Dr. Silliman conducted a follow-up examination of Plaintiff (Tr. 344-45). Plaintiff indicated her right foot pain was much better due to increased dosage of Topamax and noted no side effects from Topamax (Tr. 344). Dr. Silliman reported tone was normal in all four limbs with normal strength, and Plaintiff's neuropathic pain was well controlled with Neurontin and Topamax (Tr. 344-45).

On November 29, 2005, Dr. Nguyen examined Plaintiff and reported she complained of pain in her right thumb and paresthesia in her left arm and all fingers of her left hand (Tr. 340). Dr. Nguyen noted Plaintiff appeared to be in no distress, x-rays of her hand were negative, and she had symptoms of arthritis at right metacarpophalangeal joints with possible tendonitis of the thumb (Tr. 340). Dr. Nguyen referred Plaintiff to a hand surgeon

(Tr. 340).

On March 8, 2006, Robert Kleinhans, M.D. ("Dr. Kleinhans"), an orthopedic specialist, examined Plaintiff and administered carpal tunnel injections (Tr. 357-58). On April 11, 2006, Plaintiff returned to Dr. Kleinhans' office and complained that the carpal tunnel injections helped for only two days (Tr. 356). On April 27, 2006, Dr. Kleinhans performed right open carpal tunnel and cubital tunnel release surgery on Plaintiff (Tr. 355).

From April to July 2006, James Nealis, M.D. ("Dr. Nealis"), a neurologist, examined Plaintiff on several occasions (Tr. 359-71). On April 26, 2006, Dr. Nealis performed electrodiagnostic studies that showed mild bilateral carpal tunnel syndrome ("CTS") and right cubital syndrome (Tr. 366-67). On May 11, 2006, Dr. Nealis reported that Topamax seemed to help Plaintiff (Tr. 365). On June 28, 2006, Dr. Nealis performed a test that revealed polyneuropathy of the legs (Tr. 364). On July 20, 2006, Dr. Nealis referred Plaintiff back to Dr. Kleinhans for probable CTS and to a neurosurgeon for evaluation of Plaintiff's lumbar spine and cervical syrinx (Tr. 359-60).

On July 27, 2006, Manuel Portalatin, M.D. ("Dr. Portalatin"), wrote a letter referencing a letter Plaintiff received from Med Life Disability, dated June 21, 2006 (Tr. 377). In his letter, Dr. Portalatin expressed disagreement with Med Life Disability's "conclusions" and addressed Plaintiff's alleged impairments (Tr. 377). Dr. Portalatin indicated that he had treated Plaintiff since January 2006 for non-insulin dependent diabetes mellitus with significant peripheral neuropathy, not responding to Neurontin or Topamax (Tr. 377).[4] Dr. Portalatin stated that the peripheral neuropathy resulted in

_____

[4]The record reflects February 21, 2006 as the earliest date Dr. Portalatin examined Plaintiff (Tr. 382-83). Mable Tan, M.D. ("Dr. Tan"), examined Plaintiff in January 2006 (Tr. 384-85).

significant weakness and pain of all four extremities and that he did not think Plaintiff would be able to return to the work force and was disabled from any kind of job (Tr. 377).

On November 29, 2006, Dr. Portalatin performed a physical RFC assessment of Plaintiff (Tr. 372-76). Dr. Portalatin reported Plaintiff could only sit or stand for fifteen minutes at a time and less than two hours total in an eight-hour workday (Tr. 374). Dr. Portalatin indicated Plaintiff needed a cane for ambulation and could lift less than ten pounds frequently, ten pounds occasionally, and could never lift twenty or fifty pounds (Tr. 375). Additionally, Dr. Portalatin noted CTS significantly limited Plaintiff's ability to repetitively reach, handle, or finger (Tr. 375). Furthermore, Dr. Portalatin stated Plaintiff was unable to grasp, turn, or twist objects with her hands, execute fine manipulations with her fingers, or reach with her arms (Tr. 375). Dr. Portalatin further stated that, in his opinion, Plaintiff is unable to work (Tr. 374, 376).

On December 5, 2006, Dr. Choisser completed a physical RFC assessment of Plaintiff (Tr. 391-95). Dr. Choisser reported Plaintiff could only sit or stand fifteen minutes at a time and less than two hours total in an eight-hour workday (Tr. 393). Dr. Choisser indicated Plaintiff occasionally needed a cane for ambulation and could lift less than ten pounds frequently and could never lift ten, twenty, or fifty pounds (Tr. 394). Additionally, Dr. Choisser noted Plaintiff was significantly limited regarding reaching, handling, or fingering (Tr. 394). Furthermore, Dr. Choisser stated Plaintiff was able to grasp, turn, or twist objects with her hands ten percent of the time, execute fine manipulations with her fingers five to ten percent of the time, or reach with her arms ten percent of the time (Tr. 394). Dr. Choisser indicated that Plaintiff would miss more than three days a work per month due to her impairments (Tr. 395). Dr. Choisser reported that Plaintiff stated her

11

medications cause drowsiness, decreased memory and recall, and only control her pain without curing her symptoms (Tr. 392).

Also on December 5, 2006, Dr. Choisser wrote a letter to the Gaglione and Dumas law firm regarding his assessment of Plaintiff (Tr. 389-90). In the letter, Dr. Choisser summarized his RFC assessment and noted Plaintiff's grip strength measured 2/5 in the right hand and 3/5 in the left hand, with atrophy in both forearms (Tr. 390). Dr. Choisser opined that it was a reasonable medical probability that Plaintiff was totally and permanently disabled and unemployable for any future job applications (Tr. 390).

On December 12, 2006, Plaintiff appeared and testified at the administrative hearing (Tr. 400-51). Plaintiff stated that she had a high school education and prior work experience as a cashier, salesperson, vault clerk at a bank, mortgage processor, and mail clerk (Tr. 406-09).

Pursuant to examination by her attorney, Plaintiff testified that she had not been able to work due to pain, numbness, and tingling in her left leg and right arm that began after she had gastric bypass surgery in June 2003 (Tr. 409, 412). Plaintiff indicated that her pain progressively worsened and extended into her left arm and right leg but that the pain was worse in her left leg and right arm (Tr. 412-13). Plaintiff stated her medications helped with pain but did not help with numbness and tingling (Tr. 414-15). Plaintiff reported she could sit and stand for fifteen to twenty minutes (Tr. 416). Plaintiff clarified that her pain was controlled with medications but the tingling and numbness sensation was uncomfortable because it was chronic and something she was not used to (Tr. 417-18).

Plaintiff testified that she was right handed, could use her right hand to write for thirty minutes, and that she could use her left hand fairly normally (Tr. 418-20). Plaintiff indicated

12

she had lower back pain, neck pain, and bad headaches (Tr. 420-21).  Plaintiff stated that her medications helped with the pain (Tr. 420).

Plaintiff reported that she had a pain medication regimen that consisted of taking a pain pill followed by a muscle relaxer one to two hours later (Tr. 422-23).  Plaintiff indicated she took her first pain pill when she got out of bed in the morning and another around 2:00 p.m. (Tr. 422-23).  Plaintiff testified that after taking a muscle relaxer, she went back to bed for approximately one hour and thirty minutes (Tr. 423).  Plaintiff stated that in between her nap and second pain pill, she sat around the house or walked, washed dishes, and made her bed (Tr. 425).  Next, Plaintiff asserted she did not "just sit around" (Tr. 425).

Plaintiff reported she would be in pain if she did not take her muscle relaxer (Tr. 427).  Plaintiff clarified that she would not be able to stay awake after taking a muscle relaxer, even if she tried (Tr. 427-28).  Plaintiff stated her long-term and short-term memory were not good, she went to the grocery store and, although she is not supposed to, she drives (Tr. 428).

Plaintiff testified she took a muscle relaxer at some point before attending the hearing (Tr. 429-30).  Plaintiff's attorney then asked her if she would be able to testify and function at the hearing if she had taken a muscle relaxer, and Plaintiff answered that she could not because she would "probably be asleep somewhere" (Tr. 430).  Plaintiff indicated weakness in her legs has caused her to fall, but against objects and not always to the ground (Tr. 430).  Plaintiff stated she periodically walked with a cane (Tr. 431).  Plaintiff expressed concerns with having diabetes and the effects of the medications on her kidneys (Tr. 431-33).

Pursuant to examination by the ALJ, Plaintiff testified that she saw Dr. Neelis and Dr. Portalatin on a regular basis, which she described as once or twice per month (Tr. 434-35). Plaintiff stated she went to church on Friday nights and Sundays (Tr. 435). Plaintiff reported she went to her son's school to eat lunch with him two or three times per month, visited her mother in the country, and planned to attend her son's band concert (Tr. 436-37). Plaintiff indicated she tried to exercise once or more per day by walking to the end of her block and back one or two times (Tr. 438).

Vocational Expert Melissa Brooks (the "VE") appeared at the hearing and testified that Plaintiff's previous work included a variety of light and sedentary occupations, some of which were performed up to the medium exertional level (Tr. 442). The ALJ posed hypothetical questions to the VE in order to determine whether an individual with Plaintiff's RFC could perform Plaintiff's past relevant work (Tr. 443-49). All hypothetical claimants were 36-years old, had a high school education, and had all of Plaintiff's past relevant work experience (Tr. 443).

The ALJ's first hypothetical claimant was unable to perform more than light work activity and was not required to push or pull foot or arm controls with upper or lower extremities (Tr. 443). Additionally, the first hypothetical claimant was restricted from climbing ladders or scaffolds or working at heights (Tr. 443). Furthermore, the first hypothetical claimant was limited to occasional reaching, fingering, and feeling with the dominant upper extremity (Tr. 443). The VE testified that, given the restrictions posed, the hypothetical claimant would be restricted from performing any of Plaintiff's past relevant work (Tr. 443-45). The VE stated, however, that the *Dictionary of Occupational Titles* ("DOT") lists three unskilled occupations within the first hypothetical that are classified as

14

light exertional work that Plaintiff can still perform (Tr. 446). The first job title was counter clerk, and the VE reported that there were 11,553 positions in the regional economy and 177,513 in the national economy (Tr. 446). DOT § 249.366-010. The second job title was ticket taker, and the VE stated that 938 positions existed regionally and 12,551 existed in the national economy (Tr. 446). *Id.* at § 344.667-010. The third job title was information clerk, and the VE noted that 5,680 positions existed regionally and 91,164 positions existed in the national economy (Tr. 446). *Id.* at § 237.367-018.

The ALJ's second hypothetical individual had the limitations posed in the first hypothetical; however, the second hypothetical individual was limited to sedentary work (Tr. 447). The VE testified that the hypothetical claimant would be restricted from performing any of Plaintiff's past relevant work; however, the VE reported that the DOT listed surveillance system monitor as an unskilled occupation that Plaintiff can perform (Tr. 447). The VE stated 697 surveillance system monitor positions existed regionally and 13,557 positions existed in the national economy (Tr. 447).

The ALJ's third hypothetical question asked the VE to consider how the aforementioned jobs would be impacted if a hypothetical individual needed to alternate between sitting and standing every thirty minutes (Tr. 448). The VE testified that the ticket taker, information clerk, and surveillance system monitor jobs would not be ruled out, as they allow the ability to alternate between sitting and standing (Tr. 448). The VE indicated that the need to alternate between sitting and standing every fifteen minutes, however, would impact those jobs (Tr. 448).

In her opinion denying Plaintiff's disability claim, the ALJ determined Plaintiff had the RFC to perform a significant range of light work with the ability to lift/carry twenty pounds

occasionally and up to ten pounds frequently; could sit/stand/walk for up to six hours in an eight-hour day, with normal breaks, and with a maximum ability to sit or be on her feet for thirty minutes at a time; could not push/pull arm or foot controls; could occasionally climb stairs and ramps, but not ropes, ladders, or scaffolds; could occasionally balance, stoop, kneel, crouch or crawl; and could occasionally perform reaching, fingering, or feeling functions with her right upper extremity (Tr. 21, Finding 5).

The ALJ relied on the testimony of the VE and determined at Step Five of the sequential evaluation process that Plaintiff was not disabled pursuant to the Regulations because there were significant jobs in the economy that Plaintiff could perform despite her limitations (Tr. 23-24, Findings 10-11).

## IV. Analysis

**A.     Whether the ALJ Improperly Discounted Plaintiff's Subjective Complaints of Pain**

Plaintiff argues that the ALJ improperly discounted her subjective complaints of pain and failed to properly assess her credibility (Doc. #10 at 12).  For the reasons stated below, the undersigned is not persuaded by this argument.

When considering Plaintiff's credibility, pain and subjective symptoms alone can be impairments which result in a claimant being disabled.  *Marbury v. Sullivan*, 957 F. 2d 837, 839 (11th Cir. 1992).  A reviewing court decides whether the Commissioner's findings are consistent with the proper legal standard and are supported by substantial evidence. *Bridges v. Bowen*, 815 F. 2d 622, 624-25 (11th Cir. 1987).  42 U.S.C. § 423 (d)(5)(A) sets forth the conditions by which a claimant's subjective symptoms of pain may establish a disability.

The Eleventh Circuit has interpreted the aforementioned statute to require the Commissioner to consider a claimant's subjective testimony if the claimant has established: (1) evidence of an underlying medical condition; and either (2) objective medical evidence that confirms the severity of the alleged pain or restrictions arising from that condition, or (3) evidence that the objectively determined medical condition is such that it can be reasonably expected to give rise to the claimed pain or restriction. *Foote*, 67 F.3d at 1560-61; *Marbury*, 957 F. 2d at 839; *Holt v. Sullivan*, 921 F. 2d 1221, 1223 (11th Cir. 1991).

While the ALJ must consider a plaintiff's subjective testimony regarding pain that restricts his or her ability to work, the ALJ may reject the testimony as not credible and such a determination will be reviewed under the substantial evidence standard. *Marbury*, 957 F.2d at 839. Furthermore, the ALJ's determinations as to the credibility of a plaintiff will not be overturned if, reviewing the entirety of the record, there is substantial evidence supporting a finding of non-credibility. *Foote*, 67 F. 3d at 1562.

In the instant case, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, Plaintiff's statements concerning the intensity, duration, and limiting effects of those symptoms were not entirely credible (Tr. 22). The ALJ gave sufficient reasons why she discredited Plaintiff's subjective complaints of pain and questioned Plaintiff's credibility (Tr. 22).

To illustrate, the ALJ stated that she gave weight to the reports and opinions of Drs. Sternberg, Nguyen, Berger, Costa, Silliman, Nealis, and Knox (Tr. 22). Contrary to Plaintiff's assertion, the reports and opinions of those physicians are not consistent with Plaintiff's testimony (Doc. #10 at 18). Particularly, Dr. Sternberg reported that, despite a pain rating

17

of eight on a ten point scale, Plaintiff had full motion in her neck, she could put both hands over her head and clap, her bilateral grip was normal, all of her fingers had a normal range of motion, her lumbar flexion was normal, her lower extremity strength was normal, straight leg raise testing was negative, and her gait was within normal limits (Tr. 18, 320-23). Additionally, Dr. Nguyen's February 14, 2005 consultation with Plaintiff revealed he examined her eyes, ears, nose, mouth, heart, lungs, kidney, bladder, bowels, musculoskeletal, integumentary, psychiatric, endocrine and hematologic systems with no reported concerns (Tr. 305-06). Furthermore, Dr. Nguyen noted Plaintiff was in no acute distress and the small lesion in her brain and on her spinal cord represented no surgical problem (Tr. 306). Moreover, Dr. Nguyen indicated his consultation with Plaintiff was at the request of Marion Graham, the nurse who previously concluded that Plaintiff was unable to work due to numerous complications (Tr. 19, 305-06, 324).[5]  In his November 29, 2005 follow-up examination report, Dr. Nguyen stated Plaintiff did not appear to be in distress and the lesion in her brain stem and on her spinal cord had not changed since the previous examination (Tr. 340).

Additionally, the ALJ considered Dr. Berger's neurophysiologic examination report, wherein he noted Plaintiff had moderate to severe bilateral median nerve entrapments of her wrists and moderate to severe bilateral ulnar nerve entrapments of her elbows (Tr. 19, 286-87). The ALJ also noted Dr. Costa's treatment of Plaintiff for decreased ability to empty her bladder, where he diagnosed Plaintiff with a urinary tract infection and noted her

---

[5]The ALJ gave minimal weight to Nurse Graham's August 24, 2005 letter by noting that none of the treating physicians at Shands stated Plaintiff's medical conditions prevented her from working (Tr. 19, 324).

normal range of motion strength in all four extremities (Tr. 19, 262-63). Furthermore, the ALJ referenced Dr. Silliman's examination of Plaintiff where he reported Plaintiff's right hand and forearm dysesthesias was primarily nocturnal, Neurontin and Topamax adequately suppressed neuropathic pain throughout Plaintiff's right side except for the hand, wrist, and forearm dysesthesias, and that she had no hand atrophy and normal tone and strength were observed in all four extremities (Tr. 19, 280-81). In his September 19, 2005 follow-up examination report, Dr. Silliman indicated Plaintiff's right foot pain was much better due to the increased dosage of Topamax, Plaintiff experienced no side effects from Topamax, tone was normal in all four limbs with normal strength, Plaintiff's neuropathic pain was well controlled with Neurontin and Topamax, and Neurontin and Topamax were continued (Tr. 344-45).

The ALJ also referred to the examination report of Dr. Nealis, where he stated his electrodiagnostic study revealed evidence of Plaintiff having mild bilateral CTS (Tr. 20, 367). Lastly, the ALJ pointed to Dr. Knox's mental examination of Plaintiff, where Plaintiff informed him she had: (1) no limitation of her left hand; (2) limited ability to lift and carry with her right hand; (3) she could walk for no more than twenty minutes; (4) she went to church three days per week; (5) she went to weekend movies; (6) and she visited her mother's house for cookouts (Tr. 21, 230-31). Furthermore, Plaintiff reported that her daily activities consisted of getting her son up, feeding her baby, cooking, washing clothes, making the bed, and other "stuff" around the house (Tr. 231).

In further support of her credibility determination, the ALJ considered and attributed weight to the reports of "state agency medical consultants" who determined Plaintiff was

capable of a range of light work activity (Tr. 22, 202-07, 250-57).[6] As Plaintiff points out, one physical RFC assessment the ALJ referenced as a physician assessment was actually completed by an SDM, a non-physician who is not recognized by the Commissioner to be an acceptable medical source (Tr. 22, Doc. #10 at 4). *See* 20 C.F.R. § 404.1513. Notwithstanding the ALJ's improper classification of the SDM as a physician, the ALJ considered and attributed weight to the assessment of Dr. Morford (who is an acceptable medical source) that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk at least six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push and pull without limitation (Tr. 22, 251). Additionally, Dr. Morford reported that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. 252).

If an ALJ gives at least three reasons for discrediting a plaintiff's subjective complaints of pain, a court may find the ALJ properly discredited the subjective pain testimony. *See Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989).

Here, the ALJ pointed to Dr. Morford's state agency medical report and to the reports and opinions of the aforementioned physicians (Tr. 22). Although it would have been helpful to the reviewing court for the ALJ to articulate the specific facts in the reports and opinions of the aforementioned physicians that support her credibility weight attribution, the undersigned notes that numerous facts in the physicians' reports, discussed *supra*, call into question Plaintiff's testimony regarding her physical limitations, pain level and duration, and allegations of limited daily activities. Additionally, the undersigned's independent review of

---

[6]SDM Martin completed a report on November 21, 2003, and Dr. Morford completed a report on May 27, 2004.

the record reveals that, despite Plaintiff's testimony regarding the side effects of her medications, Plaintiff never complained of any medication side effects to the aforementioned physicians, even though they increased her dosages over time (Tr. 195, 280-81, 291, 301, 332, 344-45, 365). Furthermore, the undersigned's independent review of the record, in consideration of the ALJ's reference to the specific physicians, their reports and opinions, and her own summary of their findings, reveals substantial evidence exists to support her credibility determination.

Accordingly, and for the aforementioned reasons, the undersigned finds the ALJ properly discredited Plaintiff's subjective complaints of pain.

**B.      Whether the ALJ Properly Discounted the Opinions of Plaintiff's Treating and Examining Physicians**

Plaintiff further argues that the ALJ did not give sufficient weight to the opinions of Dr. Portalatin, her treating physician, and Dr. Choisser, an examining physician, that Plaintiff could not meet the demands of any work on a regular and consistent basis (Tr. 22; Doc. #10 at 19). The undersigned finds this argument unpersuasive, because the ALJ articulated several reasons for discounting Dr. Portalatin and Dr. Choisser's opinions (Tr. 22). Moreover, as discussed below, the undersigned finds the ALJ's reasons for discounting Plaintiff's physicians' opinions are supported by substantial evidence of record.

Plaintiff correctly notes that controlling weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise (Doc. #10 at 20). *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards,* 937 F.2d at 583. If a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic

techniques *and is not inconsistent with the other substantial evidence in the record*, the ALJ must give the treating physician's medical opinion controlling weight. 20 C.F.R. § 404.1527(d)(2) (*emphasis added*).

An ALJ, however, may discount a treating physician's opinion regarding a plaintiff's inability to work if the opinion is not supported by the evidence of record or is wholly conclusory. *See Edwards*, 937 F.2d at 583. The United States Court of Appeals for the Eleventh Circuit has concluded "good cause" exists to discount a treating physician's opinion when: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart,* 357 F.3d 1232, 1240-41 (11th Cir. 2004).

Here, the undersigned finds the ALJ properly discounted the opinions of Plaintiff's treating physician, Dr. Portalatin, by pointing to contrary evidence within the record (Tr. 22). The ALJ determined Dr. Portalatin's assessment of Plaintiff's limitations was "extreme" and, as a specific example, pointed to his conclusion that Plaintiff could not do any activity with her hands, fingers, and arms (Tr. 22, 375). The ALJ noted that this conclusion was inconsistent with everything in the record, including Plaintiff's own testimony (Tr. 22). Review of the record reveals Plaintiff testified that she could write with her right hand for up to thirty minutes, use her left hand, use a computer, wash dishes, make her bed, drive, and grocery shop (Tr. 419-21, 425, 428). Additionally, Plaintiff informed Dr. Knox she could feed her baby, cook, and wash clothes (Tr. 231).

Dr. Portalatin also reported that Plaintiff had significant weakness and pain in all four extremities and did not respond to Neurontin or Topamax (Tr. 377). Dr. Portalatin's report

22

is inconsistent with the reports and opinions of other physicians who examined Plaintiff. For example, Dr. Sternberg reported Plaintiff could reach over her head and clap her hands, had normal bilateral grips, and had normal finger and leg strength (Tr. 321). Dr. Senzon reported Plaintiff had normal muscle strength in upper and lower extremities and Topamax was somewhat effective in helping her with pain (Tr. 291, 304). Dr. Senzon indicated Plaintiff complained of leg pain but noted that she had run out of Topamax for two weeks (Tr. 301). Dr. Costa stated Plaintiff had normal range of motion and strength in all four extremities (Tr. 263). Dr. Silliman reported no observed hand atrophy and normal tone and strength in all four of Plaintiff's extremities (Tr. 280). Additionally, Dr. Silliman indicated Plaintiff's neuropathic pain was well controlled with Neurontin and Topamax (Tr. 344-45). Moreover, Dr. Nealis reported that Topamax seemed to help Plaintiff (Tr. 365).

Dr. Portalatin's RFC assessment of Plaintiff was also contradicted by Dr. Morford's report (Tr. 250-57, 372-76). The two physicians disagreed regarding Plaintiff's exertional limitations (Tr. 251,374). Particularly, Dr. Morford reported Plaintiff could sit, stand, and walk for up to six hours in an eight-hour workday, and Dr. Portalatin indicated that Plaintiff could sit, stand, and walk for less than two hours in an eight-hour workday (Tr. 251, 374).

The undersigned also finds the ALJ properly discounted the opinions of Dr. Choisser by pointing to contrary evidence within the record (Tr. 22). The ALJ noted Dr. Choisser was not a treating physician and his 2006 opinion was based on one examination (Tr. 22). Additionally, the ALJ pointed out that Dr. Choisser's findings and conclusions in 2006 were inconsistent with his evaluation of Plaintiff for the state agency in 2004 (Tr. 22, 232-35, 389-95). Plaintiff argues that Dr. Choisser's failure to offer a similar opinion, or any opinion, regarding the severity of Plaintiff's impairments in 2004 was not a reason to disregard the

opinions he offered in 2006, and that numerous pieces of relevant evidence were created between 2004 and 2006 to support Dr. Choisser's dissimilar conclusions (Doc. #10 at 24). The ALJ noted, however, that Dr. Choisser's opinions must be considered with the other evidence of record, which establishes Plaintiff has severe medical impairments and limitations that do not equate to total disability (Tr. 22).

Dr. Choisser reported that Plaintiff complained of sedation and reduced concentration from her medications, but review of the record, as discussed *supra*, reveals that Plaintiff neither complained to the numerous examining physicians about medication side effects, nor did those physicians express any concerns about side effects (Tr. 392).[7] Dr. Choisser indicated that Plaintiff could not lift over ten pounds because of weakness in the hands and noted reduced grip strength in both hands (Tr. 389-90). Plaintiff, however, told Dr. Knox she had no limitation on her left hand and testified she could use her left hand fairly normally (Tr. 230, 419-20). Additionally, Dr. Sternberg indicated she had normal bilateral grip strength (Tr. 321). Lastly, Dr. Choisser reported Plaintiff could sit, stand, and walk up to two hours in an eight-hour workday, yet Dr. Morford indicated that Plaintiff could sit, stand, and walk up to six hours in an eight-hour workday (Tr. 251, 393).

The undersigned finds the ALJ was entitled to discount the opinions of Dr. Portalatin and Dr. Choisser because substantial contrary evidence exists within the record. Accordingly, the undersigned finds the ALJ properly weighed the opinions of Dr. Portalatin and Dr. Choiser and applied the proper legal standard when determining not to give their

---

[7]In his July 27, 2006 letter, Dr. Portalatin, Plaintiff's treating physician, referenced Neurontin, Topamax, and Lyrica but did not allege any side effects to support his conclusion that Plaintiff could not work (Tr. 377).

opinions controlling weight.

## V. Conclusion

Review of the record as a whole reveals substantial evidence supports the ALJ's finding of non-disability. Accordingly, and for the reasons stated herein, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter judgment consistent with this ruling and, thereafter, to close the file. Each party shall bear its own fees and costs.

**DONE AND ENTERED** at Jacksonville, Florida this 31st day of March, 2009.

Copies to:
Counsel of Record

**THOMAS E. MORRIS**
United States Magistrate Judge